

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| MICHELIN NORTH AMERICA, INC. | § | |
| | § | |
| Appellant, | § | No. 08-17-00119-CV |
| | § | |
| v. | § | Appeal from the |
| | § | |
| BRENDA ISELA LOPEZ DE SANTIAGO, Individually and as Representative of the ESTATE OF EILEEN ARAMBULA LOPEZ, Deceased, and PEDRO ARAMBULA MERAZ | § | County Court at Law No. 6 |
| | § | of El Paso County, Texas |
| | § | (TC# 2016-DCV1638) |
| | § | |
| Appellees. | § | |

**O P I N I O N**

Appellant, Michelin North America, Inc., has filed a motion for rehearing of our June 27, 2018, decision in this case. We deny Appellant's motion for rehearing, withdraw our opinion dated June 27, 2018, and substitute the following opinion in its place.

The fact pattern in this case involves a variation on a familiar theme in civil procedure textbooks. An out-of-state tire manufacturer targets Texas as a marketplace and sells its products extensively throughout Texas. The Texas resident driver of an automobile purchased in Texas is injured and his Texas resident passengers are hurt or killed after one of the manufacturer's tires allegedly fails in Mexico. Can the tire manufacturer be haled to a Texas court to answer the driver

and passengers' product liability charges?

Michelin North America says no. Conceding that it actively markets its products in Texas, that it intends for its products to end up in Texas, that many of the tires it places into the stream of commerce do in fact end up in the hands of Texas consumers, and that the company makes a substantial amount of money from Texas sales, Michelin nevertheless insists the trial court cannot assert jurisdiction over it based on a simple jurisdictional twist. Michelin only markets *new* tires in Texas. This case involves a *used* Michelin tire, placed on the vehicle by a third party following Michelin's initial sale of the tire through distributors to an unknown party.

Michelin largely frames its argument in terms of the stream of commerce metaphor: because an intervening retail customer removed the tire from the stream of commerce and then sold the tire again on a secondary market before it ended up on the vehicle in question, Michelin asserts that jurisdictional chain is broken for all purposes, and that no specific personal jurisdiction exists over the company in Texas.

We are unconvinced by Michelin's stream-of-commerce argument and will not today adopt a *per se* rule holding that intervening retail sales necessarily cut off downstream personal jurisdiction in products liability cases. We agree with Michelin that the plaintiffs' status as Texas residents, standing alone, is not enough to confer personal jurisdiction on Texas courts; there must be a substantial connection between defendant Michelin's allegedly tortious conduct, the injury plaintiffs suffered, and the State of Texas. *Walden v. Fiore*, 571 U.S. 277, 134 S.Ct. 1115, 1123, 188 L.Ed.2d 12 (2014). Thus, the real question in this case is not whether an intervening retail sale serves as a jurisdictional chokepoint under the stream-of-commerce-plus test. The real question is whether the plaintiff's indirect purchase of an allegedly defective product on a secondary market in Texas can sustain specific jurisdiction in a Texas court when most of the

2

tortious conduct and the brunt of the injury related to that product happened outside of Texas.

We conclude that due process will permit the exercise of specific jurisdiction in this case. Michelin failed to refute the plaintiff's claim that the original tire sale took place in Texas, and the secondary sale here arose from and related to that Texas-based initial sale. The trial court's order is affirmed.

## BACKGROUND

While the parties largely talk past each other in their pleadings, the facts alleged by each side never directly clash, and Michelin has not pointed to affirmative evidence in the record—either in its initial briefing or its motion for rehearing—that would contravene the plaintiff's version of events and create a fact question on jurisdiction. *See Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010)(once plaintiff pleads sufficient allegations to bring nonresident within reach of Texas' long-arm statute, nonresident defendant has burden to negate the allegations in the pleading on either a legal or factual basis). As such, the jurisdictional question here is legal, not factual, *see id*., and we may treat the facts as being undisputed and take them as true for the purposes of deciding this appeal.[1]

Michelin North America (Michelin) is a tire manufacturer incorporated in New York with its principal base of business in South Carolina. Michelin designs and manufactures tires, but it

---

[1] We do note that while Michelin's arguments in our initial hearing of this case—at the briefing stage, in oral argument, and in several post-submission letter briefs—focused almost exclusively on the legal distinction between new and used products under general personal jurisdiction principles at large, in its rehearing response to our initial opinion, Michelin has sharpened its attack on Lopez's pleadings and the evidentiary sufficiency of her affidavit as a basis for supporting her pleading contention that the initial sale of the tire took place in Texas and/or through Michelin's distribution chain. We will address the effect of Michelin's legal sufficiency-type challenge to the affidavit later in this opinion, but suffice to say, we believe the pleadings and the state of the evidence as a whole were sufficient to allow the trial court to reasonably infer that the subject tire entered Texas new through Michelin's distribution chain. However, even if we are incorrect about the tire's precise origins, we believe personal jurisdiction can still be sustained here because, as we explain below, we reject the two major thrusts of Michelin's argument—that is, that the distinction between new and used tires is meaningful under the stream-of-commerce-plus test, and that recent Supreme Court opinions have abrogated this Court's decision in *Semperit Technische Produkte Gesellschaft M.B.H. v. Hennessy*, 508 S.W.3d 569 (Tex.App.--El Paso 2016, no pet.).

does not sell tires directly to consumers, nor are there facts in this record to support the inference that Michelin maintains any physical presence in the state of Texas. Instead, Michelin uses distributors to penetrate markets across the United States.

Michelin uses three distributor companies—Discount Tire Company of Texas, Wal-Mart Stores, and Tire Dealer's Warehouse—to sell new tires directly to consumers in Texas. At least forty-six authorized dealers sell Michelin tires in brick-and-mortar stores in the El Paso area alone. Michelin also runs a web site (www.michelinman.com) accessible to Texas consumers that allows users to directly purchase officially licensed Michelin merchandise, join a mailing list to receive Michelin promotional emails, use a configuration tool to determine which Michelin tires fit a particular vehicle, communicate live with a "Tire Concierge" that assists in finding the right tire, and search for Michelin dealerships. Michelin gathers data in Texas to monitor tire performance; allows Texas individuals to register their tires for product updates; and distributes recall information online, through its distributors, and directly to registered tire users.

Michelin is also no stranger to this State's courts. From 2001 to 2016, Michelin has filed lawsuits seeking affirmative relief in Texas courts and has answered lawsuits as a defendant in other Texas cases without contesting jurisdiction, including in other cases involving alleged tire failures.

The particular tire involved in this accident is known as a Uniroyal Tiger Paw Freedom tire. It was designed and developed in 2005 in both Ohio and South Carolina by a Michelin subsidiary company. Following the design phase, the tire was manufactured during the 11th week of 2005 at a plant in Kitchener, Ontario, Canada. According to the first amended petition in this case, "Defendant MNA [Michelin North America] shipped the subject tire to the State of Texas and delivered the same to its distributor in Texas with the intent of delivering the tire to a retailer

4

for sale in the State of Texas because MNA had directed its business to Texas." We take this to mean that the subject tire was initially transferred to a Texas distributor for sale in the Texas marketplace. Michelin never directly disputed this allegation in its special appearance.

In 2014, Brenda Isela Lopez de Santiago (Lopez) purchased a used 2002 Honda CR-V SUV from a car dealership in El Paso, Texas. The car came with Uniroyal tires already installed, and they had already been used at the time of purchase. On July 24, 2015, Lopez allowed Pedro Arambula Meraz to drive her CR-V. Lopez, her daughter, and others were passengers. As Arambula Meraz drove on a road in Ciudad Juarez, Chihuahua, Mexico, across the international border from El Paso, the right back tire on the Honda CR-V failed, causing a rollover accident. Lopez was injured in the crash, and her daughter died. Arambula Meraz was also injured.

Lopez sued both Arambula Meraz and Michelin in a Texas state district court in El Paso. With respect to Michelin, Lopez brought negligence and product liability claims. Arambula Meraz also filed cross-claims against Michelin for negligence and products liability.

According to the first amended petition in this case, "Defendant MNA [Michelin North America] shipped the subject tire to the State of Texas and delivered the same to its distributor in Texas with the intent of delivering the tire to a retailer for sale in the State of Texas because MNA had directed its business to Texas." We take this to mean that the plaintiffs allege that the subject tire was initially transferred to a Texas distributor for sale in the Texas marketplace. Michelin never directly disputed this allegation in its initial special appearance pleading by alleging, for example, that the initial sale of the tire took place outside the territorial boundaries of the State of Texas. Instead, Michelin averred in its initial special appearance pleading that "[u]pon information and belief, the subject tire was purchased used from a third party wholly unrelated to MNA."[2]

---

[2] In a first amended verified special appearance filed later, Michelin substantially repeats this same averment: "Jurisdictional discovery has shown that the subject tire was purchased in a used condition from a third party wholly

5

Michelin also did not file any affirmative evidence with its initial special appearance showing that the tire was first sold new outside Texas.

Later, after the plaintiffs filed a reply to the special appearance pleading, Michelin contended in a response that the stream of commerce ends at the point of first retail sale and that the plaintiffs provided no evidence to show the tire was in the stream of commerce because there was no evidence as to where and when the tire was originally purchased new. As with its initial special appearance pleading, Michelin did not attach any affirmative evidence showing that the subject tire was initially sold outside the State of Texas. Michelin did attach a title history from the Texas Department of Motor Vehicles and other documents related to previous transactions for the 2002 Honda CR-V to its response. The Texas Certificates of Title show that on April 3, 2002, GECU of El Paso established a lien on the vehicle, which had an odometer reading of 11 miles, as part of the vehicle's sale from Rudolph Imports, Inc., in El Paso, Texas to a buyer whose address was also located in El Paso, Texas. The Certificates of Title and other documents attached to Michelin's pleadings show that the vehicle was transferred several times among various entities and persons—all of which had El Paso addresses—before ending up at the used car lot where Lopez purchased the vehicle.

The trial court overruled Michelin's special appearance request. This interlocutory appeal followed.

## DISCUSSION

Michelin advances a two-pronged attack on the trial court's jurisdiction before this Court. In Issue One, Michelin contends that it is not "at home" in Texas for purposes of claim-blind general jurisdiction, meaning that any legitimate assertion of personal jurisdiction must tie Texas

_____

unrelated to MNA."

6

as a forum to the specific claim at bar. In Issue Two, Michelin argues that specific jurisdiction fails because the suspect tire in this case was neither designed nor manufactured in Texas, nor did Michelin directly sell the tire to Lopez. Because Michelin designs, manufacturers, and markets only new tires, and this case involved a used tire purchased by an unidentified intervening retail customer, specific jurisdiction does not exist.

We agree that no general jurisdiction exists over Michelin. A company can only be considered "at home" either in the state of its incorporation or the state where it is headquartered. Michelin is neither incorporated or headquartered in Texas. However, we disagree that specific jurisdiction is unavailable. We hold that the intervening retail sale of a Michelin tire in Texas does not *per se* insulate Michelin from personal jurisdiction in Texas, and there is a sufficient nexus between the claim, the defendant, and the State of Texas as a forum to permit the exercise of specific jurisdiction.

## A.

### Applicable Law

#### *Standard of Review*

The plaintiff and the defendant "bear shifting burdens of proof in a challenge to personal jurisdiction." *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). "[T]he plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute." *Id*. Once the plaintiff satisfies this initial burden, the defendant challenging jurisdiction "bears the burden to negate all bases of personal jurisdiction" and must tie its jurisdictional arguments "to the allegations in the plaintiff's pleading." *Id*. The defendant can challenge personal jurisdiction "on either a factual or legal basis." *Id*. at 659. "Factually, the defendant can present evidence that it has no contacts with Texas, effectively

7

disproving the plaintiff's allegations." *Id*. "Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Id*.

Michelin concedes that it has contacts with Texas, and it did not challenge any of Lopez's allegations regarding the nature of initial or intervening retail sales at all, either through conflicting allegations made in its special appearance filings or by way of contravening affirmative evidence offered at the trial court level. That converts this case from a mixed question of fact and law to a purely legal question. We apply those uncontested jurisdictional facts to the law *de novo*. *Kelly*, 301 S.W.3d at 658.

When, as here, the trial court does not file findings of fact in a special appearance, all questions of fact are presumed to support the judgment. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). A reviewing court must affirm if the judgment can be upheld on any legal theory supported by the evidence. *Happy Indus. Corp. v. American Specialties, Inc.*, 983 S.W.2d 844, 847 (Tex.App.--Corpus Christi-Edinburg 1998, writ dism'd w.o.j.).

### *Personal Jurisdiction*

Many areas of the law are defined by clear, settled rules and crisp, linear analytical approaches that spring from a common source of judicial understanding—one that is often grounded less in high-minded philosophical debate and more in practical applications and the need of litigants and courts for certainty and consistency. Personal jurisdiction is not one of those areas of law. As we have previously noted, "[s]tating the maxims for personal jurisdiction is often easier than applying them." *Semperit Technische Produkte Gesellschaft MBH* v. *Hennessy*, 508 S.W.3d

8

569, 578 (Tex.App.--El Paso 2016, no pet.). We endeavor to state and apply these maxims as best we can.

"[A] court must have both subject matter jurisdiction over the controversy and personal jurisdiction over the parties" before it may exercise its power over a legal dispute. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871 (Tex. 2010). "Subject matter jurisdiction involves a court's 'power to hear a particular type of suit,' while personal jurisdiction 'concerns the court's power to bind a particular person or party.'" *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016). This case deals with the trial court's ability to exercise personal jurisdiction.

A state court may exercise personal jurisdiction over a non-resident defendant so long as that state's long-arm statute permits it, and so long as the jurisdictional exercise is consistent with the due process limitations imposed on state courts by the federal constitution. *TV Azteca,* 490 S.W.3d at 36. Because the Texas long-arm statute allows state courts to exercise personal jurisdiction over nonresident tortfeasors to the fullest extent permitted by the federal constitution, our jurisdictional analysis rises and falls entirely in tandem with federal due process case law. *Id*.; *see also* TEX.CIV.PRAC.&REM.CODE ANN. § 17.042 (West 2015)(Texas long-arm statute).

### *The Threshold: Minimum Contacts and Notions of Fair Play*

At a federal due process level, personal jurisdiction was initially conceptualized as a function of a defendant's physical presence; a state could not hale a defendant to court unless and until the defendant was present within the forum state's physical borders. *Burnham v. Superior Court of Cal., Cty. of Marin*, 495 U.S. 604, 611-12, 110 S.Ct. 2105, 2110-11, 109 L.Ed.2d 631 (1990)(Scalia, J., plurality op.); *Int'l Shoe Co. v. State of Washington, Off. of Unemployment Compensation & Placement*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). This physical presence approach to jurisdiction later evolved under the Burger and Warren Courts in

9

response to the rise of interstate commerce and the proliferation of corporations—legally fictitious entities that had no physical bodies that could be subjected to jurisdiction. *See Burnham*, 495 U.S. at 617, 110 S.Ct. at 2114.

In *International Shoe Co.*, the United States Supreme Court dealt with the issue of corporate "presence" in discussing a state's exercise of extraterritorial jurisdiction over a non-resident corporate defendant. 326 U.S. at 315, 66 S.Ct at 158. The Court held that due process allowed states to exercise personal jurisdiction over non-resident defendants if a defendant had "certain minimum contacts" with the forum "such that the maintainance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id*. at 316, 66 S.Ct. at 158. Subsequent interpretations of *International Shoe* have treated this language as creating a test with two prongs: (1) a minimum contacts prong and (2) a fair play/substantial justice prong. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S. Ct. 2174, 2184, 85 L.Ed.2d 528 (1985).

"A defendant establishes minimum contacts with a state when it purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." [Internal quotation marks and citation omitted]. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009). "Significant contacts suggest that the defendant has taken advantage of forum-related benefits, while minor ones imply that the forum itself was beside the point." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010). "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." [Internal quotation marks and citation omitted]. *Burger King*, 471 U.S. at 476, 105 S. Ct. at 2184. Fair play/substantial justice factors include (1) the burden on the defendant, (2) the forum state's

10

interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interests of the several States in furthering fundamental substantive social policies. *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184.

The distinction between the minimum-contacts prong and the fair play/substantial justice prong of *International Shoe* is not well-delineated. Instead, both prongs interact synergistically with each other. As long as some minimum contacts have been established, deficiencies in one prong may be alleviated by countervailing strong factors on the other, and vice versa. *Id.*; *cf. Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 137 S.Ct. 1773, 1780, 198 L.Ed.2d 395 (2017)(fair play/substantial justice factors could not justify the exercise of personal jurisdiction because there was zero link between the plaintiffs, the defendant, and the forum).[3]

### General v. Specific Jurisdiction and the Need for a Forum Nexus

The Court in *International Shoe* opined that personal jurisdiction could either spring from a defendant's "continuous and systematic" activities in a state, or from single or occasional acts that "because of their nature and quality and the circumstances of their commission[] may be

---

[3] Plaintiffs and defendants alike can employ this multi-dimensional approach to either affirm or negate jurisdiction. As the United States Supreme Court explained in *Burger King*, where minimum contacts with a forum state are present but sparse, fair play/substantial justice factors may provide the extra push needed to render a state's exercise of personal jurisdiction over an out-of-state defendant constitutional. *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184 (listing cases in which fair play/substantial justice consideration "serve[d] to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required"). Similarly, a defendant who purposefully directs activities at a forum state's residents and who otherwise has minimum contacts with the forum can defeat personal jurisdiction by "present[ing] a compelling case that the presence of some other considerations would render jurisdiction unreasonable" under the fair play/substantial justice prong—though this task is admittedly more difficult. *Id.* at 477, 105 S.Ct. at 2185 (observing that most fair play/substantial justice considerations "may be accommodated through means short of finding jurisdiction unconstitutional" such as through the use of choice-of-law rules and procedural mechanisms like change of venue). This is because the minimum contacts analysis "encompasses so many considerations of fairness" that "[o]nly in rare instances will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Angelou v. African Overseas Union*, 33 S.W.3d 269, 281 (Tex.App.--Houston [14th Dist.] 2000, no pet.).

deemed sufficient to render the corporation liable to suit." *Id*. at 317-18, 66 S.Ct. at 159. These two situations identified in *International Shoe* "presaged the development of two categories of personal jurisdiction:" general and specific. *Daimler AG v. Bauman*, 571 U.S. 117, 126, 134 S.Ct. 746, 754, 187 L.Ed.2d 623 (2014).

"Continuous and systematic contacts with a state give rise to general jurisdiction, while specific jurisdiction exists when the cause of action arises from or is related to purposeful activities in the state." *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." [Emphasis in orig.]. *Bristol-Myers Squibb Co.*, 137 S.Ct. at 1780. By contrast, specific jurisdiction is jurisdiction that springs from claims raised "in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8, 104 S.Ct. 1868, 1872 n.8, 80 L.Ed.2d 404 (1984). "[F]or a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 70 (Tex. 2016).

### *General Jurisdiction*

The differences between general jurisdiction and specific jurisdiction under the *International Shoe* framework were not always clear, particularly as a defendant's contacts with the forum state became more and more extensive. *See, e.g., Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990)(finding general jurisdiction in Texas over a Pennsylvania resident based on his "continuous and systematic" involvement as an "investor, stockholder, director, advisor, lender, and guarantor" with his son's Texas dry cleaning business). But the somewhat fluid distinction between general and specific jurisdiction sharpened dramatically when the Roberts

12

Court recently refined the concept of general jurisdiction to greatly narrow its scope in a trio of recent cases.

In *Goodyear Dunlop Tires Operations, S.A. v. Brown*, the United States Supreme Court unanimously held that the exercise of general jurisdiction is limited to situations in which a defendant's "continuous and systematic contacts" with a forum state render the defendant "essentially at home" in that state. 564 U.S. 915, 919, 131 S.Ct. 2864, 2851, 180 L.Ed.2d 796 (2011). Any ambiguity about what "essentially at home" meant was dispelled by *Daimler AG v. Bauman*, in which the Court ruled that absent "exceptional" circumstances,[4] a corporate defendant was deemed to be "at home" for general jurisdiction purposes only in either (1) the state where it is incorporated or (2) the state in which it is headquartered. 571 U.S. at 135-36, 134 S. Ct. at 759.

The lines drawn by *Daimler AG* appear to act as absolute hard boundaries in the general jurisdiction context. In *BNSF Railway Company v. Tyrrell*, 137 S.Ct. 1549, 198 L.Ed.2d 36 (2017), the Court rejected substantial business activities as evocative of a corporate defendant being "essentially at home" in a state, again reiterating that the test for general jurisdiction required that a corporate defendant either be incorporated or headquartered in the forum state. In *BNSF Railway*, nonresident class action litigants sought to sue a railroad company in Montana, a state where the company did extensive business. *Id.* at 1553-54. Although "BNSF has over 2,000 miles of railroad track and more than 2,000 employees in Montana[,]" the Court held those contacts alone were insufficient to show BNSF was "at home" in Montana, especially in light of the fact that BNSF did as much business in Montana as it did in other states, which undercut any claim

---

[4] The Court in *Daimler* used *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447-48, 72 S.Ct. 413, 419-20, 96 L.Ed. 485 (1952), as an example of an exceptional case. In *Perkins*, a company headquartered in the Philippines moved its corporate office to Ohio during World War II. *Id.* The company was later sued in Ohio. The Supreme Court found general jurisdiction over the company in Ohio. *Id.* The *Daimler* Court explained that even though the company's principle place of business was in the Philippines and there was no formal incorporation of the company in Ohio, under the case's unusual facts, general jurisdiction was proper. *See Daimler*, 571 U.S. at 139 n.19, 134 S.Ct. at 761 n.19.

that BNSF was "at home" in Montana. *Id*. at 1554, 1559.

As such, absent extraordinary circumstances, general jurisdiction is limited to those locales in which a corporate defendant is either incorporated or headquartered.

### *Specific Jurisdiction*

#### *The Stream of Commerce Metaphor*

Although the general jurisdiction analysis has shifted in recent years, the specific jurisdiction analysis at the United States Supreme Court level has largely remained static since the late 1980s: specific jurisdiction requires a defendant's minimum contacts with the forum along with a nexus between those contacts and the claim at hand.

In *Asahi Metal Industry Company, Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the justices unanimously agreed that a Japanese tire valve manufacturer that sold components to a Taiwanese tire manufacturer that in turn sold a defective tire in California could not be made to answer the Taiwanese company's indemnity charge in California state court. The justices all thought that such an exercise of personal jurisdiction would not comport with traditional notions of fair play and substantial justice under the second prong of *International Shoe*. However, the justices splintered over the issue of minimum contacts under the first prong of *International Shoe* and what test should be used to determine whether specific jurisdiction over a certain defendant exists in a given state.

One four-member wing of the Court, led by Justice Brennan, espoused the "stream of commerce" test arising out of a metaphor first articulated in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale." *Asahi Metal Indust. Co.,* 480 U.S. at 117, 107 S.Ct. at

14

1034 (Brennan, J., plurality op.). The Brennan plurality believed that after an item is placed into circulation, jurisdiction travels with that item regardless of where it is swept by the regular stream of commerce. Quoting language from *World-Wide Volkswagen*, this wing of the Court held that "if the *sale* of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, *directly or indirectly*, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owners or to others." [Emphasis in orig.]. *Asahi Metal Indust. Co.,* 480 U.S. at 119, 107 S.Ct. at 1036 (quoting *World-Wide Volkswagen*, 444 U.S. at 297-98). The Brennan plurality also noted the difference "between a case involving goods which reach a distant State through a chain of distribution and a case involving goods which reach the same State because a consumer . . . took them there." *Asahi Metal Indust. Co.,* 480 U.S. at 120, 107 S.Ct. at 1036. The former situation would justify an exercise of jurisdiction. *Id.* The latter situation was more complicated. The Brennan plurality contemplated possibilities in which a product enters a forum state not through regular distribution channels, but through "the course of its intended use by the consumer" or "foreseeable resale in another State." *Id.* at 120 & n.3, 107 S.Ct. at 1036 & n.3. Under those circumstances, the Brennan plurality believed jurisdiction would still inhere in the situs of the product's presence, provided that the item's presence in the forum was not the result of an unforeseeable fortuitous or one-off unilateral action of a consumer. *Id.* In essence, the only limit on personal jurisdiction under the stream of commerce test is foreseeability: jurisdiction inheres in whatever forum the item is present, so long as the item's presence in the forum was foreseeable and not the result of some unforeseen "eddies" in the stream of commerce. *Id.* at 117, 107 S.Ct. at 1035.

Another four-member wing of the Court, led by Justice O'Connor, insisted that the stream

of commerce test was too lenient, and instead advocated for a stream-of-commerce plus test in which placement of an item into the stream of commerce was necessary—but not sufficient—to allow a state court to assume jurisdiction over a claim. For them, "[t]he 'substantial connection' . . . between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State*." [Emphasis in original]. *Asahi Metal Indust. Co.,* 480 U.S. at 112, 107 S.Ct. at 1032 (O'Connor, J., plurality op.). Certain additional factors beyond placement into the stream of commerce could show that the defendant purposefully targeted the forum. *Id.* "Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.* But for Justice O'Connor and her cohort, a "defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *Id.* The O'Connor plurality never addressed the hypothetical situations brought up by Justice Brenann involving the foreseeable arrival of an item after retail sale.

Justice Stevens, the lone holdout in *Asahi*, declined to join either plurality opinion, but issued one of his own. Justice Stevens criticized the other pluralities for addressing the minimum contacts issue at all, instead arguing that the Court should have limited itself to considering only the question of fair play/substantial justice and resolved the case on those grounds. *Id.* at 121-22, 107 S.Ct. at 1036-37 (Stevens, J., plurality op.).

Because no one minimum contacts rationale garnered the necessary five votes to command

16

a majority, no one test for specific jurisdiction was ever adopted as federally controlling. In the intervening years since *Asahi*, the United States Supreme Court has still not decided which specific jurisdiction test should ultimately control. Indeed, during the United States Supreme Court's last foray into specific jurisdiction, the Court has either issued decisions that either reinforce settled principles, *see Bristol-Myers Squibb,* 137 S.Ct. at 1780 (holding that non-California plaintiffs could not sue a New York headquartered company in California court when their injuries from taking an allegedly defective drug had nothing to do with the California forum), or split again into different plurality rationales that all ultimately failed to carry the day. *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 883-885, 131 S.Ct. 2780, 2788-90, 180 L.Ed.2d 765 (2011)(Kennedy, J., plurality op.)(four justices reject the stream of commerce test and proposed an intent-to-submit-to-a-sovereign approach in an attempt to clarify *Asahi*); *id*. at 890-92, 131 S.Ct. at 2792-94 (Breyer, J., concurring)(two justices agree that an exercise of jurisdiction would be unfair but explicitly decline to endorse the test espoused by the plurality or to reject the stream of commerce metaphor); *id*. at 899-906, 131 S.Ct. at 2797-2802 (Ginsburg, J., dissenting)(three justices reject plurality's state sovereignty-based/implied consent analysis).

Given this void, approaches to specific jurisdiction vary from state to state and federal circuit to federal circuit. Some jurisdictions adhere to Justice Brennan's broader stream of commerce test while others use Justice O'Connor's narrower stream of commerce plus test in assessing specific jurisdiction. The Fifth Circuit uses the stream of commerce test; Texas courts use the stream-of-commerce-plus test. *Semperit Technische Produckte Gesellschaft M.B.H.*, 508 S.W.3d at 576. Under the principles of *stare decisis*, until the United States Supreme Court resolves the *Asahi* conflict and issues a decision that supersedes the Texas Supreme Court's approach, we as an intermediate Texas appellate court must apply the stream of commerce plus

test to assess specific jurisdiction. *Id.*

*Nexus*

Although United States Supreme Court case law often elides the difference between minimum contacts and nexus and sometimes treat them as one syncretic analysis, Texas courts choose to treat minimum contacts and nexus as separate inquiries. *See Moki Mac Expeditions v. Drugg*, 221 S.W.3d 569, 579 (Tex. 2007). To establish nexus, the plaintiff must show a substantial connection between the nonresident defendant, the litigation, and the forum. *Id.*

***Personal Jurisdiction Today***

Synthesized to its core, the Texas personal jurisdiction analysis can be broadly expressed as a two-step theory:

1. If a corporate defendant is **incorporated or headquartered in Texas**, Texas state courts have **general jurisdiction** over the defendant. The courts may hale the defendant to answer **any claim** brought by any plaintiff—even where the claims involve actions occurring outside the forum of Texas, and even where the plaintiff is not a Texas resident.

2. If a corporate defendant is ***not*** incorporated or headquartered in Texas, Texas state courts may only exercise **specific jurisdiction** over the out-of-state defendant **if the defendant's actions are sufficiently related to Texas** so as to subject the defendant to specific jurisdiction in Texas. In determining whether an exercise of specific jurisdiction is permissible, Texas courts use the **stream-of-commerce-plus test**.[5] That test requires:

   - A defendant's minimum contacts with Texas, as evinced by the defendant's purposeful availment of Texas;

   - The lack of any fair play/substantial justice considerations that would stand as an obstacle to jurisdiction; and

   - A nexus (i.e. a "substantial connection") between the defendant, the forum, and the claim at hand.

---

[5] We note that even when a Texas court's exercise of jurisdiction, general or specific, is constitutionally permissible, the Texas court can *decline* to exercise jurisdiction under the doctrine of forum non conveniens if "in the interest of justice and for the convenience of the parties a claim or action to which this section applies would be more properly heard in a forum outside this state[.]" TEX.CIV.PRAC.&REM.CODE ANN. § 71.051(b)(West Supp. 2017). Because Michelin did not argue forum non conveniens in the trial court, we do not reach that issue on appeal.

**B.**

**Analysis**

The plaintiffs maintain that the trial court could have properly exercised personal jurisdiction over the case on either general or specific grounds. We address these arguments in turn.

**1.**

**General Jurisdiction**

We first address general jurisdiction, and dispel the notion that it applies in this case. While the plaintiffs are correct that Michelin's ongoing efforts to target Texas are pervasive, longstanding, lucrative, and highly successful, those contacts do not subject Michelin to general jurisdiction in Texas. Whatever door may have been open under the previous general jurisdiction framework has since been shut by *Goodyear*, *Daimler*, and *BNSF Railway*. This trio of cases is clear. General jurisdiction applies only in states where a corporate defendant's systematic and continuous contacts render it "essentially at home." *Goodyear,* 564 U.S. at 919, 131 S.Ct. at 2851. A corporate defendant is only "essentially at home" in those states in which it is incorporated or headquartered. *Daimler*, 571 U.S. at 135-36, 134 S.Ct. at 759. And even extensive, longstanding, continuing business activity within a state will not render the corporate defendant amenable to claim-blind general jurisdiction if that corporation is neither incorporated or headquartered in the forum state. *BNSF Railway*, 137 S.Ct. at 1559. Because Michelin North America is not incorporated in Texas, nor is it headquartered here, Texas as a forum cannot exercise general jurisdiction over the company. Michelin has successfully negated general jurisdiction. Only specific jurisdiction that ties Michelin's activities in the forum with the claims asserted could support the trial court's exercise of personal jurisdiction.

Issue One is sustained. To prevail on appeal, Michelin must also succeed on Issue Two. It cannot do so.

**2.**

**Specific Jurisdiction**

Michelin also asserts that specific jurisdiction does not exist in this case. Although the majority of Michelin's brief focuses on the stream of commerce and the minimum contacts prong, we construe Michelin's brief as challenging both the minimum contacts prong and the nexus prong.

*i.*

*Minimum Contacts*

*Point-of-First Sale as Jurisdictional Chokepoint*

The bulk of Michelin's brief urges this Court to find that the intervening retail sale of a product automatically cuts off personal jurisdiction over the product's manufacturer, and that jurisdictional "liability" extends only as far as the point of first retail sale. To put this in terms of the stream of commerce metaphor, Michelin believes that every stream of commerce stops at the point of first retail sale. Any sale that takes place on a secondary market involves placement of the product into a second stream of commerce unconnected to the first stream.

Michelin contends that multiple jurisdictions have ruled across that board that used products exit the stream of commerce at the point of first retail sale. In support of this contention, Michelin cites more than a dozen cases, mostly from federal district courts, in which personal jurisdiction was lacking.[6] But none of the cases announce a *per se* rule. Indeed, the case that

---

[6] *D'Jamoos ex rel Estate of Weingeroff v. Pilatus Aircraft, Ltd.*, 566 F.3d 94, 106 (3rd Cir. 2009); *Hinrichs v. Gen. Motors of Canada, Ltd.*, 222 So.3d 1114 (Ala. 2016), *cert. denied* 137 S.Ct. 2291, 198 L.Ed.2d 724 (2017); *Istre v. Montco Offshore, Inc.*, No. 12-2054, 2016 WL 1110227, at *3 (E.D.La. Mar. 22, 2016); *Eddy v. Printers House (P), Ltd.*, 627 F.App'x 323, 327 (5th Cir. 2015); *Francis v. Bridgestone Corp.* No. 2010/30, 2011 WL 2650599 (D.V.I. July 6, 2011)(mem. opn.); *Erwin v. Ford Motor Co.*, No. 8:16-cv-01322-T-24 AEP, 2016 WL 7655398 (M.D. Fla. Aug. 31, 2016); *Gaillet v. Ford Motor Company*, No. 16-13789, 2017 WL 1684639 (E.D. Mich. May 3, 2017); *Walters v. Nakata Eng'g Co., Ltd.*, No. 08-1458, 2009 WL 1813131 (W.D.Pa. June 25, 2009); *Haines v. Get Air, L.L.C.*, No.

comes closest to announcing the rule that Michelin advances, like so many other specific jurisdiction cases before it, resulted in a splintered opinion. In *Hinrichs v. General Motors of Canada*, *Ltd.*, while a four-member plurality of the nine-member Alabama Supreme Court did seem to agree with the argument that an allegedly defective truck manufactured in Canada exited the stream of commerce at the point of first sale in Pennsylvania, *see,* 222 So.3d 1114, 1138 (Ala. 2016)(per curiam)("it is undisputed that the stream of commerce for the Sierra ended at its sale in Pennsylvania . . . "), a fifth justice concurred only in the result reached by the main opinion, not the rationale. *See id*. at 1142 (Bolin, J., concurring). We note that under similar facts, the Supreme Court of Appeals of West Virginia explicitly *rejected* a rule that would set the point of first retail sale as a jurisdictional chokepoint in the stream of commerce analysis. *See State ex rel Ford Motor Company v. McGraw*, 788 S.E.2d 319, 342-43 (W.Va. 2016)( "We decline to use the place of sale as a *per se* rule to defeat specific jurisdiction.").

Rather than showing a concerted effort by numerous courts to mark the point of first retail sale as a jurisdictional chokepoint, the cases Michelin cites are highly-fact bound and show only the application of standard specific jurisdiction principles to the facts at hand. A closer look reveals that the distinction between new versus used was not dispositive in those cases. Rather, those cases all involve defendants who never purposefully availed themselves of the forum state, *see, e.g., D'Jamoos ex rel Estate of Weingeroff v. Pilatus Aircraft, Ltd.*, 566 F.3d 94, 103 (3rd Cir. 2009)(Swiss airplane manufacturer could not be sued in Pennsylvania for product defect because manufacturer had limited contacts with forum); and products that would not have foreseeably made their way to the forum state but for the unilateral actions of a third person. *See, e.g.*, *Eddy v.*

---

CV-15-00002-TUC-RM (EJM), 2017 WL 1067777 (D.Ariz. Feb, 24, 2017); *Ganey v. Kawasaki Motors Corp., U.S.A.*, 234 S.W.3d 838 (Ark. 2006); *Abraham v. Agusta, S.P.A.*, 968 F.Supp. 1403 (D.Nev. 1997); *Parry v. Ernst Home Ctr. Corp.*, 779 P.2d 659 (Utah 1989).

*Printers House (P) Ltd.*, 627 F.App'x. 323, 327-28 (5th Cir. 2015)(Indian manufacturer that custom designed a printing press for a customer in Mississippi could not be sued in Texas where subsequent purchasers unilaterally brought the press to Texas because Indian company did not target Texas); *Francis*, 2011 WL 2650599 at *6 (no jurisdiction over Bridgestone tires in the U.S. Virgin Islands because Bridgestone did not sell tires in the Virgin Islands and the specific tires were sold and designed for European market and ended up in the territory by unilateral actions of others); *Istre*, 2016 WL 1110227, at *3 (Indonesian manufacturer of defective switch could not be sued in Louisiana under maritime law for accident in Louisiana waters where switch was manufactured in Indonesia, shipped to a distribution center in France, then to another distribution center in Hungary, then eventually to a Czech company that incorporated the switch into a winch system that was shipped and sold to Alabama).

If anything, these cases show why a bright-line rule is not needed here. The stream-of-commerce-plus framework of purposeful availment and foreseeability is flexible enough to deal with different fact patterns raised in different procedural postures. A rigorous and fair application of personal jurisdiction principles will lead to different results in different cases, but ultimately still protect defendants from litigating in unfair forums while still allowing plaintiffs to sue at home when appropriate.

Nearly two years ago, litigants in *Semperit Technische Produckte Gesellschaft MBH*, tried to advance a similar bright-line first-sale argument before this Court. *Semperit* involved an Austrian manufacturer of high-pressure hoses used in oilfield equipment. The manufacturer sold an allegedly defective hose to a wholly-owned subsidiary in New Jersey. The New Jersey subsidiary sold it to an Oklahoma distributor, who then resold the hose into Texas. 508 S.W.3d at 573-74. The Austrian manufacturer, sued in Texas, argued that jurisdiction stopped at the point

22

of first sale in New Jersey, and that the product ended up in Texas only by virtue of the unilateral third actions of the downstream distributor. This Court disagreed, finding that personal jurisdiction flowed through to Texas because the Austrian manufacturer deliberately targeted Texas as a marketplace, and that the manufacturer profited from the direct sale of hoses to Texas; the direct sale of hoses to its New Jersey subsidiary, which sold to Texas; and indirectly once the New Jersey subsidiary sold hoses to the Oklahoma distributor, who in turn sold the hoses to Texas. *Id*. at 579-81.

In deciding *Semperit*, we expressed hesitation in adopting "a rule that mechanically focuses only on whether the actual failed product was sold in Texas," opining that such a rule could have the unforeseen consequence of arbitrarily cutting off home forum relief for Texas resident product liability plaintiffs who buy a product online through Amazon.com and find their order being fulfilled by a different distributor than the authorized one that services a brick-and-mortar store selling the exact same product down the road. *Id*. at 584. We continue to harbor such hesitations, and will not adopt such a rule today. *Accord McGraw*, 788 S.E.2d at 342-43 (West Virginia Supreme Court declining to use place of sale as a *per se* rule to defeat specific jurisdiction and finding proposed rule to be inconsistent with specific jurisdiction principles).

Michelin complains that without a bright-line rule declaring retail sales to be the end of the stream of commerce, various problems will arise. For example, Michelin argues that without an explicit first sale limitation, the extensive business Michelin does through distributorships in all fifty states would lead to exercises of specific jurisdiction in all fifty states that start to look functionally like general jurisdiction in all states.

In the first place, it is axiomatic that business activities in a state are a double-edged sword. "When a nonresident defendant has purposefully availed itself of the privilege of conducting

23

business in a foreign jurisdiction, it is both fair and just to subject that defendant to the authority of that forum's courts." *Spir Star AG*, 310 S.W.3d at 872. An entity that purposefully avails itself of a state for profit also subjects itself to that state's legal regulation and cannot escape that regulation by attempting to hide behind the shield of federalism. "There is nothing wrong with an enterprise arranging its affairs so that it avoids doing business in or engaging in activities directed toward a particular forum and thereby precludes that forum's exercise of jurisdiction over it." *Moki Mac*, 221 S.W.3d at 589 (Johnson, J., dissenting). But if a defendant has not so arranged its affairs, then it "should reasonably anticipate being haled into court" in the forum. *Id*.

In the second place, Michelin overstates the ability of state courts to resolve claims against it. As *Bristol-Myers Squibb* teaches, there are limits even when a corporation does business in all fifty states. The nexus requirement cabins a court's jurisdiction to the specific facts of a case. Plaintiffs' claims against a defendant must still relate to the forum in which suit is brought. An Ohio resident cannot bring a personal injury claim in California against a New York defendant corporation if the Ohioan did not purchase, use, or suffer injury from the product in California— even if other people similarly situated people in California *did* suffer injury in California. 137 S.Ct. at 1780.

It may be that under current personal jurisdiction principles, manufacturers are generally more likely to be subject to jurisdiction than lower-tiered distributors and sub-distributors in the stream of commerce. *Compare Semperit*, 508 S.W.3d at 584 (jurisdiction over manufacturer despite the presence of intervening steps in a distribution chain because manufacturer targeted forum state) *with World-Wide Volkswagen,* 444 U.S. at 297-98, 100 S.Ct. at 567-68 (no jurisdiction in Oklahoma over New York car dealership that only targeted New York area in sales). But even among manufacturers, there is a difference. A huge manufacturer that does business in all fifty

states and intends for its products to be sold nationwide is more likely to be subject to personal jurisdiction more often in more places[7] than, say, a foreign manufacturer selling component parts to another foreign manufacturer,[8] a European airplane manufacturer whose plane ended up in New Jersey by a fluke eddy in the stream of commerce,[9] an Indian manufacturer that custom-makes a printing press for a Mississippi customer but is then sued in Texas,[10] a tire manufacturer whose products only ended up in the U.S. Virgin Islands by the unilateral acts of a third party,[11] or a boutique manufacturer whose pottery made it from an Appalachian storefront to Hawaii by sheer happenstance.[12]  That is not a bug in the system; that is the entire point of the system.

As is, the stream-of-commerce-plus test provides an adequate framework by which we may determine whether the point of first sale represents an item's last foreseeable or intentional destination.

### *The Stream of Commerce Test: One Stream or Two?*

Now we turn to the heart of the matter—or at least, what the parties believe the heart of the matter to be.  The opposing sides argue their positions in broad terms and frame the dispute as

---

[7] *Tarver v. Ford Motor Company*, No. CIV-16-548-D, 2016 WL 7077045, *5 (W.D. Okla. Dec. 5, 2016)(rejecting Ford's special appearance in case involving a defective F-150 that caused injury in Oklahoma where truck was manufactured in Missouri and purchased at a dealership in Indiana; "The pivotal inquiry under the stream of commerce theory is whether a defendant has attempted to serve a market and expects its product to be used there.").

[8] *Asahi*, 480 U.S. at 112-13, 107 S.Ct. at 1032-33 (O'Connor, J., plurality op.)(manufacturer's subjective awareness that part may be incorporated into product sold in California, standing alone, did not grant California the right to exercise jurisdiction over part manufacturer); *Istre*, 2016 WL 1110227, at *3 (Indonesian manufacturer of defective switch could not be sued in Louisiana under maritime law for accident in Louisiana waters where switch was manufactured in Indonesia, shipped to a distribution center in France, then to another distribution center in Hungary, then eventually to a Czech company that incorporated the switch into a winch system that was shipped and sold to Alabama).

[9][9] *D'Jamoos*, 566 F.3d at 106.

[10] *Eddy*, 627 F.App'x at 327.

[11] *Francis*, 2011 WL 2650599 at *6.

[12] *Nicastro*, 131 S.Ct. at 2793 (Breyer, J., concurring).

being over whether there was only one stream of commerce, or two. In truth, we see strengths and weakness with the approached advanced by both Michelin and Lopez.

On the one hand, Texas' assertion of specific jurisdiction in a products liability case like this seems to fit the basic requirements of the stream-of-commerce-plus test. Michelin placed the tire into the stream of commerce. The stream of commerce ultimately swept the tire into Texas and into the hands of a Texas end-user. Michelin targets Texas and intends for its tires to end up in the hands of Texas consumers. And it is not the foreseeability of a defendant causing injury in another state that serves as the benchmark for personal jurisdiction; the real question is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Burger King Corp*, 471 U.S. at 474, 105 S.Ct. at 2183. Michelin could have reasonably foreseen that the tire would end up in Texas, and given the company's extensive targeting of the state, it could hardly be surprised that it would be haled to court to answer defect charges in Texas. "[I]f the sale of a product of a manufacturer . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer . . . to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others." *Spir Star AG*, 310 S.W.3d at 878 (citing *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567). We would not be alone in reaching this conclusion. *See, e.g., Tarver v. Ford Motor Company*, No. CIV-16-548-D, 2016 WL 7077045, at *5 (W.D. Okla. Dec. 5, 2017)(rejecting Ford's special appearance in case involving a defective F-150 that caused injury in Oklahoma where truck was manufactured in Missouri and purchased at a dealership in Indiana; "[t]he pivotal inquiry under the stream of commerce theory is whether a defendant has attempted to serve a market and expects its product to be used there").

26

On the other hand, this case does not involve the predictable sale of a product from a primary tier distributor to a sub-tier distributor that directly targets the Texas forum. This case involves sale on a secondary market outside of Michelin's direct control—a secondary market that does not adhere to Michelin's business priorities and that could send Michelin products to places the company never targeted or contemplated. Given the United States Supreme Court's instructions to not elide the distinction between general and specific jurisdiction, we are cautious about ensuring that the nexus requirement is met. And given that the Texas Supreme Court has stated that the fact "that similar products were sold in Texas would not create a substantial connection as to products that were not[,]" *Spir Star*, 310 S.W.3d at 875, we do not wish to adopt a close-enough-for-horseshoes approach that leaves litigants uncertain and leaves this case exposed to the possibility of reversal.

The stream of commerce metaphor, "like other metaphors, has its deficiencies as well as its utility." *Nicastro*, 564 U.S. at 881, 131 S.Ct. at 2788 (Kennedy, J., plurality op.). This case exposes the limits of using the stream of commerce metaphor as a legal test. Whether this case involves one continuous stream of commerce or the portaging of an item from one stream to another is less a matter of legality and more a matter of perspective. We are inclined to believe this scenario represents the uninterrupted, albeit indirect, flow of one stream of commerce foreseeably bringing an item into a forum targeted by Michelin—a forum, we note, in which Michelin should have reasonably expected to be subject to litigation.

But at the hazard of mixing metaphors, perhaps a shotgun analogy better describes this situation. If a manufacturer takes a shotgun shell approach to marketing and deliberately aims a batch of product at multiple states, it seems odd to let the manufacturer complain that even though its product actually struck a targeted state, the point should not count simply because there was an

27

unexpected ricochet along the way.

Michelin targeted Texas. The tire hit its target. Michelin expected and wanted the tire to hit its target. Whether Michelin made money off the specific sale to Lopez is not strictly relevant to the minimum contacts theory. *Cf. Semperit*, 508 S.W.3d at 584 (mentioning the indirect benefit an Austrian manufacturer got from an Oklahoma sub-tier distributor's sales of the manufacturer's product to Texas).

The distinction Michelin draws between the tire being "new" and "used" is a distinction without a jurisdictional difference for minimum contacts purposes. The focus of a products liability case is the condition of the product at the time it left the manufacturer's possession. *Id.* at 584. Part of what makes Michelin's new-versus-used argument so compelling at first glance is the implicit idea that the tire's condition may have been altered by intervening downstream purchasers in different locales. It is true that the potential for a change in condition increases as time passes and the item changes multiple hands. But that, to us, sounds like a merits question on whether the tire's failure was actually Michelin's fault. That question has zero bearing on the trial court's ability to exercise personal jurisdiction over Michelin. We do not resolve merits-based questions in reviewing a special appearance. *Pulmosan Safety Equip. Corp. v. Lamb*, 273 S.W.3d 829, 839 (Tex.App.--Houston [14th Dist.] 2008, pet. denied).

In sum, Michelin has purposefully availed itself of Texas as a marketplace for its tires, and it was reasonably foreseeable that it would have to answer suit in Texas related to those tires. Minimum contacts are established.

*ii.*

*Nexus*

Minimum contacts alone are not enough to confer personal jurisdiction. "Specific-

jurisdiction analysis has two co-equal components." *Moki Mac*, 221 S.W.3d at 579. "[P]urposeful availment has no jurisdictional relevance unless the defendant's liability arises from or relates to the forum contacts." *Id.* A nexus must be shown "between the nonresident defendant, the litigation, and the forum." *Id.*

The United States Supreme Court has given little guidance as to how much of a nexus is required. The Court recently touched on the nexus requirement in *Bristol-Myers Squibb v. Superior Court of California, San Francisco County*. There, several hundred nonresident plaintiffs joined a few dozen California resident plaintiffs in a suit against a pharmaceutical company over the drug Plavix. 137 S.Ct. at 1778. The nonresident plaintiffs "were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California." *Id.* at 1781. The California Supreme Court found there was jurisdiction over the nonresident plaintiffs under a sliding scale approach the state employed which excused a lack of ties between the litigation and the forum if the defendant's contacts with the forum were pervasive. *Id.* at 1778-79.

The United States Supreme Court reversed. But apart from repudiating California's "sliding scale" approach to specific jurisdiction, *id.* at 1781-82, *Bristol-Myers Squibb* did not illuminate much about the nexus standard, but largely involved an application of "settled principles:" when there is no factual connection between a defendant's contacts in a forum and the plaintiffs' claims, there is no personal jurisdiction over the defendant. *Id.* Contrary to Michelin's argument, we do not read *Bristol-Meyers Squibb* as having any bearing on this case, nor do we read the case as abrogating this Court's decision in *Semperit*. Rather, *Bristol-Meyers Squibb* deals primarily with nonresident *plaintiffs* seeking to join in class actions with resident plaintiffs against nonresident defendants despite the fact that the nonresident plaintiffs were

injured outside the forum and there was no substantial connection between the defendant's conduct, the forum, and their injuries. *See id.* at 1785 (Sotomayor, J., dissenting)(noting that *Bristol-Meyes Squibb* operated to limit the ability of nonresident claimants to join in class action suits). Here, the plaintiffs are Texas residents. *Bristol-Meyers Squibb* does not apply. *Accord Align Corp., Ltd. v. Allister Mark Boustred*, 421 P.3d 163 (Colo. 2017), *cert. denied* -- S.Ct. --, 2018 WL 1142978 (June 11, 2018)(finding *Bristol-Meyers Squibb* inapplicable where plaintiff was resident of the forum state).

Given that there is no federally controlling standard for nexus, the standard set down by the Texas Supreme Court in *Moki Mac Expeditions v. Drugg* controls. In *Moki Mac*, Texas resident parents sued a Utah-based travel company in Texas after their son died on a hiking trip in Arizona. 221 S.W.3d at 573. The parents alleged that the travel company misrepresented the nature of safety measures that would be undertaken on the trip in literature and advertising that the company distributed in Texas. *Id*.

The Texas Supreme Court, after surveying the approaches to nexus taken in other jurisdictions, *see generally id.* at 580-84, adopted a "substantial connection" rule in which there must be a substantial connection between a defendant's contacts with Texas and the operative facts of the litigation. *Id*. at 584-85. The Court characterized this as a middle-ground approach that eschewed the problems created by having a broad but-for causation test (i.e. but for an advertising misrepresentation the plaintiff would have never gone on a trip in which the plaintiff was injured), a narrow substantive relevance/proximate cause test that makes a defendant's purposeful contact "an essential liability element," or a sliding scale approach like the one that would ultimately be struck down in *Bristol-Myers Squibb*. *Moki Mac*, 221 S.W.3d at 582.

Applying the substantial connection test, the Texas Supreme Court found that the trial court

could not exercise personal jurisdiction over the Utah travel company. The Court accepted as true the plaintiffs' contention that their son would not have gone on the trip but for Moki Mac's advertising suggesting the trip would be safe for a beginning hiker, but nevertheless held that advertising in Texas was not a substantial enough connection. *Id*. at 585-86. The operative facts of the case overwhelmingly concerned the actions of Moki Mac's guides in Arizona, and Moki Mac's contacts with Texas in light of the operative facts of the case were peripheral. Summarizing its analysis, the Court stated: "Whatever connection there may be between Moki Mac's promotional materials sent to Texas and the operative facts that led to Andy's death, we do not believe it is sufficiently direct to meet due-process concerns." *Id*. at 585.

*Moki Mac* and this case do share one important, under-briefed aspect: the situs of injury happened outside the territorial boundaries of the State of Texas. Neither party in its briefs or oral argument emphasized this as an issue, instead choosing to focus their attention on the new-versus-used issue, so we ourselves will not belabor it as an issue. We take our lead from the parties' briefs. However, the nexus tie between the claim in this case and Texas as a forum is much stronger than the tie presented in *Moki Mac*. *Moki Mac* held that an out-of-state defendant's advertising activities in Texas, standing alone, were not enough to support specific jurisdiction in a personal injury case. 221 S.W.3d at 585-86.

By contrast, here, Lopez has alleged that Michelin, through its distribution network, offered the tire for sale in Texas. On rehearing, Michelin cautions us against resting an opinion on the "false premise" that the trial court had sufficient evidence to find that the initial tire sale took place in Texas. Specifically, Michelin contends that Lopez's allegation that the initial tire sale took place in Texas must be supported by evidence, and that Lopez fails to point to any evidence that would suggest an initial tire sale took place in Texas. Lopez counters that she properly pleaded

31

affirmative facts establishing personal jurisdiction and that Michelin in its initial special appearance pleading never directly contested her allegation that the initial tire sale took place in Texas, meaning that absent affirmative contravening evidence from Michelin that the tire sale did *not* take place in Texas, Lopez's allegation is sufficient to support the trial court's finding that the initial sale *did* take place in Texas. *See Kelly*, 301 S.W.3d at 658-59 (if a plaintiff pleads sufficient allegations to bring nonresident defendant within Texas long-arm statute, nonresident defendant must negate allegation as matter of law or matter of fact).

We agree with Lopez that Michelin did not specifically contest the allegation that the tire was sold in Texas in its initial special appearance pleading. Lopez contended that the initial tire was sold through Michelin's distribution networks in Texas, whereas Michelin's response only stated that Lopez bought the tire used from a party unconnected to Michelin. These allegations do not clash. Only later in a responsive pleading did Michelin raise a no-evidence-type challenge to Lopez's first sale allegation. It is unclear as a matter of course whether that belated challenge to the allegation was enough to put the issue before the trial court. Still, we need not delve too far into the issue of who bore what burden or whether Michelin properly refuted Lopez's allegation. We must affirm the trial court's judgment if it was valid on any theory advanced in the court below. *Happy Indus. Corp. v. American Specialties, Inc.*, 983 S.W.2d 844, 847 (Tex.App.--Corpus Christi-Edinburg 1998, pet. dism'd w.o.j.). And we make all factual inferences in favor of the trial court's judgment so long as those inferences are reasonable and the facts underlying those inferences find legally sufficient footing in the record. *Id.* Viewing the record that was before the trial court, we believe there was sufficient evidence to support Lopez's allegation that the initial tire sale took place in Texas.

The record before us shows that the 2002 Honda CR-V was purchased in 2002 by a buyer

32

in El Paso from a seller in El Paso. Title to the vehicle then transferred several times until the vehicle reached Lopez. All title transfers for the vehicle that appear in the record took place among buyers and sellers located in El Paso. The record also shows that the specific tire was manufactured in 2005, after the vehicles' initial purchase in El Paso. From this information, it is reasonable to infer that some person or entity that owned the vehicle changed the tires out from the original tires on the CR-V sometime after 2005. Given that all the CR-V's owners since 2002 have been El Paso residents, given Michelin's pervasive penetration of the El Paso market through distributors, and given the lack of any affirmative evidence showing that the tire was purchased elsewhere, we believe it would be reasonable for the trial court to infer from the evidence before it that the El Paso owner of the CR-V purchased the tire new in El Paso, within the territorial boundaries of the State of Texas.

We previously stated in *Semperit* that we were not "impressed with a rule that mechanically focuses only on whether the actual failed product was sold in Texas." *Semperit*, 508 S.W.3d at 584. We continue to believe that a mechanical application of a first sale chokepoint in assessing both stream of commerce and nexus is not only unwise; it runs contrary to the fact-intensive nature of personal jurisdiction jurisprudence. Indeed, the state of the record shows there is a more direct nexus to the forum in this case that in *Semperit*. In *Semperit*, a foreign manufacturer targeting Texas shipped product to a U.S. subsidiary, which in turn shipped to a sub-distributor, which in turn shipped the product to the plaintiffs. *Id*. Here, the record is sufficient to have allowed the trial court to determine that the first sale took place in Texas after Michelin transferred the tire for a first retail sale in Texas through the usual distribution pattern. That falls squarely within the ambit of *Semperit*.

The tire's subsequent purchase, again in Texas by a Texas resident, arose from and relates

to the tire's initial sale in the state. In our view, the nexus here is strong enough to support specific jurisdiction. *Cf. Pulmosan Safety Equip. Corp.*, 273 S.W.3d at 841 (finding personal jurisdiction in Texas over New York manufacturer of defective respiratory hood where worker was injured in Texas and there was no direct evidence the hood was sold in Texas, although it could have been).

Issue Two is overruled.

## CONCLUSION

The trial court properly exercised personal jurisdiction over this case. The judgment of the trial court is affirmed.

August 2, 2018

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.